5-8-2-0-5-4-1. The Quuoin Home Lumber v. The Workers' Compensation Commission. May it please the Court, Mr. Smith, my name is Kelly Phelps and I represent the appellate of Quuoin Home Lumber. When I sat down to prepare for oral argument, look through briefs, and obviously by the time the case reached, the work comp case reached this level of the appellate court, kind of the last to brief this thing in depth, read all the different arguments that were thrown at each other back and forth, and I think we'll kind of pull back from it a little bit and whittle down. And really, when I look at this case, this seems like this is a case where the commission's decision is against the man that's putting the evidence, and that's really where I wanted to focus my argument this morning on. In this particular case, there were eight applications filed by Mr. Fred. They dismissed four, amended some, and then proceeded to arbitration on four applications. There was another insurer that had two cases. Those haven't been appealed. But my two cases are the accidents on 12-3 of 2010 and 12-23 of 2010. And in this particular case, I looked back through and tried to identify what exactly was the insurer's or the commission's decision that there was an accident, a work accident on 12-23 of 2010. The commission said that there was no accident on 12-3 of 2010. Now, these cases were all consolidated, and the evidence was all the same. And I'm kind of a little bit perplexed how the commission kind of went in and said, On three of the cases, we don't find that there was an accident. But on this last one, this one, yeah, he got it right. And looking through that, really, I can see where the petitioner identified in his briefs really three facts that they claim supports the commission's decision. The first one is they rely on this office note from the Tri-County Chiropractic, and I think the date of that was on 1-26 of 2011. And at the bottom of that sheet, it says that the petitioner knows full back he didn't have to live through the problem. That's really all that the commission has had on. And I don't think that's sufficient for the commission to make the decision that it did. It doesn't support it. And I'll talk about that here in just a second. Does medical evidence have to be introduced to support a claim? No. Okay. Well, then we get to the petitioner's testimony and his credibility. And I don't think he is credible. Well, he obviously says that he was. Right. But I think when we look at, I mean, just saying somebody's credible doesn't make it so. Well, there's got to be some evidence to support that. And I think in this one, I mean, Mr. Fred was coming and going. I mean, he says that he was hurt so bad on 12-3-10 that basically he did nothing but show up for work and sit down. If that's true and we're going to hold that, how was he hurt on 12-23-2010? Well, didn't the commission realize there were some inconsistencies that overall they found incredible? Well, and that's what I'm trying to figure out. What's the commission hanging their hat on is credibility. They said he wasn't impeached. I mean, he was impeached repeatedly. I mean, there wasn't a single fact that intensified it to you on direct that wasn't somehow impeached. They called him to question on cross. And they say the other thing they say is when you take it into consideration, I think the language that they use, that Fred's testimony relative to the 12-23 accident is supported by the medical evidence. So what they're really saying is there is no, we're not going to, his testimony relative to the 12-3 accident is not supported by the law. But if you look at that, what medical evidence supports his claim that he was injured on 12-23-2010? All right, let's talk about this Tri-County note that says he noticed low back pain after lifting the drywall. If you look back through the eight applications that he filed alleging an accident on all different dates, six of those eight applications claim that he was injured lifting drywall. So that fact that he says, I noticed my back pain lifting drywall doesn't do anything to support their claim that he got hurt on 12-23-2010 lifting drywall. Why not? Can't you be injured more than once lifting drywall? Well, which time? Well, he testified that on that date he felt pain lifting drywall. Well, what did he testify to? He testified that he felt pain when he was lifting drywall, didn't he? Yeah. Then why can't they believe him? Because he also said that after he got hurt on 12-23-2010 that he just came to work and sat. Then he later testified that, well, yeah, when they introduced the delivery slips, he said, well, I did. I just drove with a truck. Other people did the loading and unloading. That's what he said. And the commission said, well, we find him believable because he wasn't in peace. I don't, I mean. Well, let's assume that we disagree with you on that. Why don't you tell us what the argument is about the TTE? Are you talking about the, on the zip sheet? Was he entitled to 200 and some odd weeks of TTE? Or was he restricted to the 75 weeks or whatever it is? Well, the commission found that he reached MMI on 6-22-12. So I don't, I mean, I think that if you're going to find that he was, that he did suffer an accident, I think that's when his condition reached its permanency. He reached MMI on 6-22-12. So in your argument, he's only entitled to 75 and 272 weeks? If you're going to uphold the commission, they're finding that he suffered an accident, quote, within 15 days. What about the stip and the discussion with the arbitrator before the arbitration on the question of whether there was a stipulation that he suffered 200 TTE? There was a similar issue to that. That the law is very clear on that. The station's in control. We closed market. We disputed TTE. And we didn't have to. What was the basis for the finding that he reached MMI on June 22, 2012? Well, Vaughn said he was at MMI on that date, did he not? Yes. And whose witness was Vaughn? So even if there had been a stipulation at the beginning of 200 and some odd weeks, when the petitioner introduced evidence contrary to that petition, was the commission able then to award only to the MMI date of June 22nd? I think the support for them to do that, yes. But I don't see the point that you stipulated that he was... I asked you a hypothetical. You know, hypotheticals mean you don't have to agree with the facts. You just have to answer the problem. Yeah. So to answer your question, Justice, I agree with your hypothetical on that. Okay. In terms of in looking at the other thing that they looked at, I mean, if you look at the, you know... Also, there's actually nowhere in the record, in any of the medical records, where he gives a history that he suffered an accident on 12-23-2012. In fact, if you look at the very first records that he went to when he went to the chiropractor on January 13th, 2011, that's known to date of onset of 12th of December 30th, 2010. And it says that again on January 14th, 2011, when he goes back to the same chiropractor. It still mentions the same date of onset. Even Petitioner's Council admitted in a statement of exceptions that there's no history of any 12-23-2010 accident when he said that it is true that none of Petitioner's medical records list December 23rd, 2010 as the date of onset of symptoms. The only specific history in the medical records is that of Dr. Sauer. And that's when Petitioner went on March 2nd, 2011, when he was examined by Dr. Sauer. And that history states, Mr. Fred has a quiet physical job working for a lumberyard. He reports that he noticed gradually increasing back pain in the work that he does over a number of years. He states that he's a deliberate person and has to live in a pack of shingles which is quite heavy. And then it says, he reports that his back pain began upon waking from sleep on January 12th, 2011. He did not have any new injury or trauma at that time. I mean, I think that is an admission by the Petitioner in this case that he had not suffered any recent trauma or injury. I mean, here's what I think he really came down to, is they proved a repetitive trauma case that happened on January 11th of 2011, which was the date that he last worked. And I think this history supports that. But that's not the case that they tried. They tried a specific injury case, alleging a date of accident of 12-23-2010. What about this theory here? Is it possible, is it a legitimate argument, that what happened in December was just the cumulative aggravation of all the cumulative accidents that he had? It doesn't have to be the sole and the only cause, as you know. What if all the history of these accidents cumulatively aggravated a pre-existing condition? Is that compensable? Not on the way that they presented it. They moved forward on a specific injury case. They did not allege repetitive trauma. I think what's difficult on that, when you're trying to defend that, is you're trying to hit a moving target. At what point? I mean, the defense has to be able to defend a claim and know what is the accident that you're claiming. And in this one, they're claiming that they got hurt on 12-23-2010. And there's just no evidence to support that. And I understand that this group, Fred, can say, yeah, I got hurt on that date. But if you can look at what their own expert, Dr. Bond, he couldn't even give a history to Dr. Bond. He said, well, I got hurt sometime in, I think it was early, on or about December of 2010, I was carrying a sheetrock. And then he gives another history of early 2011, I was taking the sheetrock off a forklift. I mean, this is one where you've got to look at the evidence as a whole. And I think, really, I mean, the arbitrator may know this, that she was concerned with the fact that Mr. Zoller, which is the owner of the Lumber, didn't come to testify. And she felt that that was concerning, but she goes into great depth where she says, you know, when I examined the testimony of Mr. Fred, that became less of an issue. And he's just not believable. There's nothing that he states. There's no evidence that he gives that I can hang my hat on. And the commission just whitewashes that. And it was a split decision, 2-1, all right, where there's just nothing to support that. I mean, if you take Mr. Fred at his testimony, he stopped working physically after December 3, 2010. So at what point, then, how can he get hurt on December 23, 2010? And the other thing that we've got to do, there's one specific history in his medical records, and it's this one to Dr. Sarbanes where he says, I did not suffer an injury or a trauma. And at that point, the commission just ignores that. And I don't see how somebody can be credible when there's nothing in the medical records to support an accident on December 23, even when he went to his own I.M.E., quote, I.M.E. doctor. And if you look at that, remember, the history that Dr. Vaught prepared in his written report was the same history that was in the cover letter from the Tister's Council to Dr. Vaught. So, I mean, what's just clear here is, if you look at this evidence, I think Mr. Fred's back was hurt. He just could not say when he hurt it. Now, had he pursued repetitive trauma case, I think Justice Hudson's point earlier would be more, you know, relevant. But here he said, I got hurt on December 23, 2010, and I was lifting sheetrock. And you're saying there's no evidence he got hurt on that day? There's no evidence he got hurt on that day. We're not disputing that he was working on that day and made a delivery, are we? There's a delivery slip that shows that he made a delivery to Carl Goldman's house on December 23, 2010. So he was working that day? He was working. And I think if you look at the delivery slips, I think those actually cut against him, because what those delivery slips show is that he continued to work and deliver after December 23, 2010, up to the last day of work on January 11 of 2011. He was working. He was doing his job. Those slips do nothing to support your claims, because if they did, why wasn't the slip strong enough to support him on December 23, 2010? It wasn't. He delivered on December 23, 2010. For those reasons, I would ask that the Commission, I would ask that this Court reverse the Commission's decision. Thank you. Thank you, Counsel. We have time for another question. Counsel, you may respond. Thank you, Your Honor. May it please the Court, Mr. Phelps, my name is Brian Smith, and I represent Paul Thread in this case. I'd like to start with what we believe to be the only question of law before you today, and that is the issue of the TTE award. Commission awarded 75 and two-sevenths weeks. That was not the Commission's decision to make pursuant to the stipulation between the parties. There was a clear and unambiguous stipulation that occurred on the record as Arbitrator Lindsey was going through the issues that were delineated on the request for hearing. The specific language is, quote, Respondent does not dispute the dates of temporary total disability, but does dispute liability for the benefits, end quote. That is enough for a binding stipulation. The argument that that stipulation is not memorialized on the request for hearing is without merit. This is a clear and unambiguous stipulation. To rely on the request for hearing, first of all, not every stipulation has to be on a request for hearing. That's not a requirement. Number two, even if it were, the request for hearing doesn't say something different than what was on the record. On the record, if, for example, on the record, it said Respondent stipulates to those dates, but the request for hearing form says they don't stipulate to the dates, then I think we've got a real problem, where the response for the request for hearing is at odds with something that happened on the record. But that's not what happened in this case. The request for hearing form doesn't even complete. It simply says disputes, and then the portion where it says and claims, it's left blank. So request for hearing forms are interpreted as contracts, and so if we're going to look at a contract that is ambiguous, we look at the parole evidence to find the intent of the parties, and there is no better parole evidence in this case to determine the intent of the parties than the on-the-record conversation where arbitrator Lindsay narrowed the issues and all parties agreed to that statement. Even assuming there is no stipulation, the commission's award is still in the manifesto of the evidence. It's based on Paul Fred allegedly reaching MMI on June 22, 2012, based on the date that he last saw Dr. Hayward. It completely ignores Dr. Hayward's note where he says he's not done, I want to see him back, he needs CT scans, he needs flexion and extension x-rays, I want to see him back, and it's likely I'll release him in a year, 52 weeks later. It also ignores Paul Fred's testimony telling the reason why he didn't go back to Dr. Hayward, and that was he couldn't afford it because he'd deployed a wrong number and canceled his self-insurance. There is no evidence that his condition stabilized on June 22, 2012. I have Dr. Vaught testifying that he reached MMI on April 6, 2015, and Justice Hoffman, you alluded to some testimony from Dr. Vaught. If that testimony is in there, I apologize, but I have Dr. Vaught testifying. You're right, it was April. In April of 2015. Yes, that's correct, April 1. Forming the basis for the claim of 224 set of weeks of TTB benefits. So the commission's cherry-picking June 22, 2012 has to be against the manifesto of the evidence because it flies in the face of TTB analysis. When we quoted the 1982 Freeman United decision where the appellate court rejected that analysis, stating the argument that I already issued. That is simply a misstatement. There's one application for adjustment claim that is issued for this court, and it is the one for the December 23, 2010 accident. There were several applications filed. One was a consolidated claim, claiming an accident on December 3, 2010. That is not an issue here. There were two other acute trauma in 2007 and 2008 that were consolidated in the trial. Also not an issue here. There were others that were plagued in the alternative repetitive trauma theories, and they were dismissed prior to the trial. So to say that there are eight applications that imply that Paul Fred is taking a dart to a calendar and trying to pick days, that's just simply not the case. I can dispense with those. I want to talk about accident and causation, because that formed the majority of Detroit Homeowners' arguments today. They were impassioned arguments, and they may very well rule today if this is a de novo review, which it clearly is not. This is a manifest way to the evidence case as it relates to accident and causation. What do you make of this argument that there was no accident on December 22, 2010? Well, there is evidence in the record to support the commission's decision that there was, in fact, an accident on December 23, 2010. And that would be what? First is Paul Fred's credible testimony that he was delivering or returning sheetrock or drywall to Carl Goldman's house on that date. Credibly testified that he was scooping through a doorway and felt a pop, and it hurt his back, and he continued to work until January 10 or 11, where he said, I couldn't even put my socks on. That was credible testimony. It's supported by Dr. Cochran, I think, Tri-County Chiropractic's note from just a few weeks later that says, I was hurt lifting drywall. It's supported by the history given to Dr. Vaughn by Paul Fred that said, I was hurt in this time frame. And by the way, you have to take a step back and not ignore, the commission didn't ignore this, DuPont and Lumber did, the reason that Paul Fred didn't have specific dates when he filed his application for adjustment of claim. He did not have specific dates when he saw Dr. Vaughn. The reason was, he did not have access to the work tickets that were solely and exclusively in DuPont and Lumber's custody. We didn't get those until we subpoenaed them. And he credibly testified, once I got those work tickets, I was able to pick up the long jeans on 12-3, which isn't even an issue here. And I was able to pick out Carl Goldman's house on 12-23, which is the one we're here on. So, Paul Fred's credible testimony, the work slips, the history given to Dr. Vaughn, the history given to Dr. Cochran, and his symptoms remained consistent following these histories. Following the accident, he has 10 out of 10 back and right-sided pain, which he never had before. All of his intermittent chiropractic treatment from before was all 6 out of 10 and on the left side. With new symptoms, new problems, at a greater velocity than DuPont, 10 out of 10. And those don't stop. Unlike his other prior intermittent chiropractic treatment, this doesn't stop. He goes to the chiropractor, he's referred for an MRI, he's referred to a surgeon, he has a two-level fusion and four-level altogether surgery in his lumbar spine that prevents him from ever returning to work. It all happened within 6 months, give or take, of this December 23, 2010 accident. So, there is ample evidence in the record to support finding of accident. Therefore, the commission's decision can't be against the manifest way of the evidence. DuPont home lumbar points to SI pain management's history where it's documented that he said that his pain started on January 10 or 11 or 12 or in that period with no new accident. It's a little bit of a disingenuous argument, particularly as Paul Fred testified about this. And it's consistent with what he said, that I was injured, I continued to work to the best of my ability. Maybe it wasn't lifting, but it was driving or operating the forklift. And I sustained no new injury on the day that I just simply could not go back to work. The commission has never been in the business of punishing claimants who are injured at work and then continue to work to the best of their ability as much as they can or as long as they can until they can literally not go back to work because of the pain. That's the history in the SI pain management's notes. And to suggest that it implies that his pain just started out in the blue in the middle of December, excuse me, in the middle of January or 11, it's just simply inconsistent with all of the rest of the evidence in this case. Causation, the decision by the commission is clearly not against the manifest way of the evidence. The commission found Dr. DuPont more credible than Dr. Crane. Dr. DuPont and Dr. Crane testified that he was at a significant disadvantage in this case because he never met the petitioner. And he said it's almost the most important thing that he does when determining the meaning of the patient is to meet the patient and find out how he was injured. And he agreed, I'm at a disadvantage because I never got to meet that in this case. So when we boil down accident and causation, it's not against the manifest way of the evidence because there is ample evidence in the record to support it. But the stipulation on TTE is the question of law, that you have the ability to look and say that this decision by the commission of awarding only 75 and two-sevenths weeks is contrary to law because the commission never had that issue in front of it. In fact, we cited the Walker case, and it's a very similar case where the party stipulated to a certain amount of temporary total incapacity, and the commission enters an award that is well below that. And the appellate court says you can't do that, commission, because that issue is not before you because of the stipulation of the parties. That's the same thing as this case. In his examination of June 22, 2012, did Hayward restrict him from work on that day? I'm sorry. Dr. Hayward never placed any particular work restrictions on that. I have to believe that is due to Paul Fred's testimony about how he told Dr. Hayward's office, you need to process this through my group health because my boss, Bruce Zoller, told me that you are not eligible for workers' compensation benefits. That testimony is unrebutted in the record. What evidence is there in the record that as of June 12, 2012, he could not work? His testimony, Paul Fred's testimony. And then the testimony of Dr. Bodd, where he says on April 6, 2015, you're a maximum medical improvement and your current restrictions are 50 pounds lifting, no snooping, no squatting, no bedding. So there is a little bit of a gap in the medical records as to what his restrictions were, but between Dr. Bodd and Paul Fred's testimony, even Dr. Hayward saying, I need you back here to have additional diagnostic tests in here, suggests that he was not able to work during that period, which is consistent with the stipulation entered into by the parties. And it is inconsistent with the award by the commission, even barring the stipulation. There's further evidence that the commission's award on TTE was against the manifest way of the evidence. So for all of those reasons, unless you have any other questions, Paul Fred respectfully requests that you affirm everything except the TTE award and find it a matter of law. Thank you, Counsel. Counsel, you may reply. Yes, Your Honor. I'd like to address this TTE stipulation. The law is clear on that, it's the skip sheets. I do take a little bit issue in the solicitation of the record transcript when Arbitrator Linton was going through the list of the skip sheets. I think when you look through this, we were going through four skip sheets in two different carriers, and the skip sheets had been filled out in turn. And on the skip sheet, it clearly is marked that we disputed TTE. There's nothing that says that we have to give an explanation on that skip sheet of what the basis of that is. It's just whether to bring to the attention, and the purpose of the skip sheets is to glean the issues down. So we mark that we were disputing TTE. Now, what Petitioner's Counsel is trying to do is to manufacture some stipulation because of this ambiguous reading of the issues back into the record by Arbitrator Linton. And if you look at that, I never conceded that it was only on just the length of it. All right? She goes through and she says the entire portion of the transcript says Petitioner is claiming temporary total disability benefits from January 13, 2011 to April 6, 2015, a period of 224 sentence weeks. Respondent does not dispute the dates of temporary disability, but does dispute liability for benefits. The issue goes on. There is no claim for temporary partial disability or maintenance. There are no credits to be provided to Respondent in the order of temporary total disability. And it's my understanding that there are identical claims of TTE being made in two of these cases, but Petitioner is not seeking a double recovery. And Mr. Smith, Petitioner's Counsel, says that is correct, Judge. I have not given opportunity to say anything, and I don't say anything in response to that. Were you standing there when that recitation was given by the Arbitrator? Were you standing there? I wasn't standing there. I mean, we were at a bench. All right, but you heard that recitation. I'm going to be honest with the Court. I don't remember her specifically saying there's not a dispute liability for benefits. Well, it's in the record. It's in the record. I'm not going to dispute that she said that. But I don't remember hearing that, and I did not respond to that. Because then she goes on to say, and I knew that I was disputing TTE. I marked it on the skip sheet. Okay? Then she goes on and says, thank you. The nature and extent of Petitioner's injury is in dispute. So in summary, the issues in dispute in 13 WC 1093.1 are accident, notice, causal connection, medical bills, temporary total disability, and nature of stint. Is that correct? Mr. Smith says, yes, Your Honor. And then I replied, yes, Your Honor. So I never. So you never affirmatively agreed that it was 200 and some odd weeks. I never. You only affirmatively agreed that TTE was an issue. Was in dispute. And the law is clear on that. For a stipulation to be intervened to, it has to be clear, unambiguous. And the only thing that they've got to stand for is that I was silent when she made that. And silence is not enough to, you know, say that was a stipulation. You stipulated it to the TTE. So, I mean, the stipulation sheets are there for a reason. And I just think that that's, you know, that's all I've got to say on that. I think it's clear on that. The other thing I will say is this issue of TTE. Mr. Fred didn't do anything after June 26, 2004. He never went back to his treatment. He never went back and got any other medical treatment. He never looked for a job. He wasn't restricted from working. He did nothing. Until Petitioner's Counsel sent him to Dr. Vought on April, whatever, 2015. I mean, we can only assume that if he had sent him to Dr. Vought on June 23rd. Assuming that the Petitioner introduced evidence, Dr. Vought, the date of his letter, April 15th, whatever it was, that he was at MMI, what evidence did you introduce that he was at MMI at an earlier date? Well, I think the fact that the evidence was that he sought no additional treatment. He wasn't restricted. And then he did nothing. And the burden is on me. No, but he introduced evidence of the date of MMI, April, which would have been the 270-some days. So what evidence did you introduce that it was at an earlier date? Your only answer is he didn't, after he saw Hayward in June, that he got no further treatment. Well, I think if you look through the cross-examination of Dr. Vought, that opinion of MMI is just the date that he picked up. Because that's the date he sought. Exactly right. You can't say anything before that. The law on that is very clear that it's a claimant's burden to prove not only that he did not work, but that he was unable to work. There's no evidence that he was unable to work. You can be at MMI. What was his testimony and his ability to work? Well, it was everywhere. Because some of his testimony was that on December 3rd of 2000, after that, he didn't work anymore. In this situation where he says that, I mean, Mr. Stitt says that it's punishment. I think requiring a plaintiff to be able to articulate an accident is not punishment. That's the law. And they didn't do this case. Thank you. Okay. Thank you, Counsel Bullock, for your arguments in this matter. It will be taken under advisement that this position shall issue. And it will stand in recess until 1.30.